FILED

2019 Jun-24  PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| BILAL UZ ZAMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.: 7:16-cv-01677-LSC-JEO |
| | ) | |
| WILLIE THOMAS, Warden, and the | ) | |
| ATTORNEY GENERAL FOR THE | ) | |
| STATE OF ALABAMA, | ) | |
| | ) | |
| Respondents. | ) | |

## REPORT & RECOMMENDATION

This is an action on a *pro se* petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (Doc.[1] 1). Petitioner Bilal Uz Zaman is serving a twenty year sentence at the Bibb County Correctional Facility in Brent, Alabama, following his August 2015 conviction for first degree sodomy. The action is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b), FED. R. CIV. P. 72(b)(1), and LR 72.1(b)(3)(A). Upon consideration, it is recommended that Zaman's habeas petition be denied.

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system. Unless otherwise noted, pinpoint citations are to the page of the electronically filed document, which may not correspond to pagination on the original "hard copy."

# I.    Procedural History and Background

## A.    Trial Proceedings

On August 1, 2013, a grand jury in the Circuit Court of Morgan County, Alabama, issued an indictment against Zaman, alleging that he "engage[d] in deviate sexual intercourse with [M.G.E.] by forcible compulsion, in violation of Section 13A-6-3 of the Code of Alabama." [2]   (Doc. 5-1 at 9-10).  Zaman pled not guilty.  (*Id.* at 18-19).  Attorney H. McGriff Belser represented Zaman at trial.  (*Id.* at 22).  The trial evidence is set out below.

T.E., M.G.E.'s mother, testified that M.G.E. attended special education classes from kindergarten through high school; in 2012 he received an attendance diploma.  (Doc. 5-2 at 29-33).  Due to his inability to "focus on the task" M.G.E. had been unable "to hold down full-time employment;" his last job at local grocery store ended because M.G.E. could not learn the cashier position and wandered off from his mopping task to talk to people in the store.  (*Id.* at 33-34).  At the time of trial, M.G.E. lived at home with his parents and his three siblings.  (*Id.*).  T.E. described him as "very trusting of everyone;" "he has always been calm and always been friends with everybody.  Everyone is a friend."   (*Id.* at 30-31).

---

[2] All references herein to the Alabama Code are to the 1975 codification.

M.G.E.'s high school rehab program "worked with" him "for three whole months straight" on his driver's license permit test and he succeeded in obtaining a driver's license; however, he drove "wide open" and "got several tickets and didn't realize what to do with" them.  (*Id.* at 33).  M.G.E.'s mother and father did not know about the tickets until April 2013, when 19 year old M.G.E. called from Morgan County Jail to tell them he had been arrested.  (*Id.* at 34).  T.E. testified that her husband would not allow her to bail M.G.E. out of jail and they decided to try tough love to show him the consequences of his actions.  (*Id.* at 34).

In his trial testimony, M.G.E. admitted he drove his muscle car too fast and "got a whole lot of speeding tickets.  When I was arrested they said I had 14 speeding tickets that turned into a warrant, but I went to jail on all that."  (*Id.* at 36-37).  M.G.E. stayed in jail thirteen days "to work off" the ticket fines.  (*Id.* at 38). For the first day and half, jail officials housed M.G.E. in the "drunk tank," and then on April 6, 2013, they moved him to a C-Pod, a two story felon detention unit equipped with cells and a downstairs dayroom/eating area.  (Doc. 5-1 at 40, 42; Doc. 5-2 at 39-41).  Zaman was housed in M.G.E.'s cell pod.  (Doc. 5-2 at 41-42). Most of the inmates in the pod "had been there a while," and on his first evening in the pod, M.G.E. went with a group of inmates to Zaman's cell.  (*Id.* at 43).  Zaman and a couple of his friends immediately stated the following:

let me see what kind of ass you got.  So then I pulled down my pants [and underwear all the way to my knees] and I showed them because I was afraid because it was him and whole lot of other ones in there, probably four or five.  I was afraid.  So I did that.  [One of the guys said I had a nice ass.]  And I walked out, and then I just kept hearing rumors, that just kept slapping and all that so.

(*Id.* at 44).   M.G.E. could not remember any comments made specifically by Zaman, but he had never been talked to by adults "like that before."  (*Id.* at 45).  M.G.E. denied he had ever been in Zaman's cell with "Zaman and some others when somebody took a pen and said if you were going to give a blow job would you show us how you do it on this pen?"  (*Id.* at 58-59).  He also denied simulating the act with the pen or asking other inmates, "'What size d---ks they have.'"  (*Id.* at 59).  M.G.E. admitted he told an inmate that he "would do anything for cigarettes."  (*Id.*).

During the trial, Morgan County inmate Gaston King (then detained for a pending drug charge) and former Morgan County inmate John Carr (then serving a 21 year sentence for robbery) testified they remembered being Zaman's cell when "Zaman was messing with" M.G.E., "telling him to shake his but[t] and show us what he's working with and just, you know, homosexual type questions and comments to him."  (*Id.* at 73, 77, 81-83).  Carr saw Zaman "smack" M.G.E. on his "tail" during the time that he told him to drop his pants.  (*Id.* at 89-90).  King stated that M.G.E. was new to the jail and "looked like a little kid," and Carr agreed that

4

M.G.E. was "a kid" and "the youngest one in the pod as far as" he knew.  (*Id.* at 74, 85, 89).  Although "anybody new at the jail gets a razzed a little bit," both King and Carr "could tell [M.G.E.] was scared and wasn't comfortable with it.  That's why . . . everybody left the room because we didn't want to part of it no more." (*Id.* at 74-75, 88).  Inmate Carr considered Zaman's actions "a whole different level of cutting up, hazing[]" and "absolutely" believed Zaman "had homosexual intentions toward" M.G.E.  (*Id.* at 88).  King also testified, "Just by the way [Zaman] was talking to [M.G.E.] you could tell he wasn't playing.  He was being serious about it."  (*Id.* at 78).  Neither King nor Carr ever heard a conversation concerning a pen and a simulated sex act.  (*Id.* at 79, 91).

M.G.E. agreed that meals at the jail were "not very tasty," and at "5'6" and "175 pounds"[3] he felt hungry all the time.  (*Id.* at 46, 62).  During dinner in the common area M.G.E. noticed that Zaman had a Nutty Buddy bar and he asked if he could have it.  (*Id.* at 47).  Zaman said "yeah."  (*Id.*).  As soon as M.G.E. ate it Zaman said, "You have to come do something for me."  (*Id.*).  M.G.E. went to Zaman's room.  (*Id.* at 48).  Zaman told Pierce Preston, his cellmate and a "pretty stout guy," to "walk out because we was about to talk about something."  (*Id.* at 48-49).  Preston left and Zaman "was like, well, since I gave you that Nutty Buddy

---

[3] According to his April 16, 2013, driver's license, M.G.E. is 5'10'' and weighed 225 pounds. (Doc. 5-1 at 41).

bar you're going to have to do something for me.  I was like, what is that?  He was like, you have to get down and suck my d--k."  (*Id.* at 49).  M.G.E. did not want to and had never done anything like what Zaman asked of him.  (*Id.*).  M.G.E. told Zaman he did not want to it, but Zaman told M.G.E. that "him and a couple of his buddies was going to beat me up."  (*Id.* at 49, 56).  M.G.E. did not know who Zaman's buddies were but "wasn't trying to find it out."  (*Id.* at 56).  M.G.E. did as he was told and then spat in Zaman's sink.  (*Id.* at 51).  Preston walked back in the room and asked, "What did ya'll do?  And [M.G.E.] said, Zaman forced me to suck his d--k."  (*Id.*).  M.G.E. then walked downstairs and used a call button to "talk to the main lady up in the front office."  (*Id.*).

During his testimony, Pierce Preston (then a state inmate serving a 20 year split sentence for armed robbery) recognized Zaman as being his cell mate for a while but did not recognize M.G.E.  (*Id.* at 68-69).  Preston admitted he liked Zaman well enough to "fight somebody" for him.  (*Id.* at 70).  Preston denied giving a statement to investigators saying Zaman "messed up" and declared he had stated "other inmates said he messed up."  (*Id.*).  He also denied all knowledge of the incident.  (*Id.* at 70-71).

Inmate King knew inmate Preston and testified that Preston lied when he said he knew nothing about the incident as it was Preston "that come and told me

and Carr that something had happened in the cell that was actually like a sexual type thing."  (*Id.* at 77).  Further, King watched M.G.E. come out of Zaman's room, "some discussion" occurred, and

> Me [and inmate Carr] went to the officers and told them that they needed to get [M.G.E.] out of our cell, that he didn't need to be in there and he was being sexually harassed.  And [M.G.E.] come out on the rec yard and told the officers what had happened, told us what happened, and you could tell that he was emotionally disturbed from the incident that occurred in the cell.  So they got him and moved him out, put us back in the cell.

(*Id.* at 75).  Carr testified M.G.E. came down and sat in the rec yard and "looked upset.  He looked like he lost his best friend."  (*Id.* at 86).  Carr told him not to let anyone trick him into doing something he did not want to do and to tell them Carr had his back.  (*Id*. at 86, 95).  As the two talked, Carr realized "right then [M.G.E.] had some learning disability because I've got brothers that are mentally handicapped."  (*Id.* at 88).  Corrections Officer Dean testified inmates King and Carr asked to speak with her and reported the incident between Zaman and M.G.E. (*Id.* at 100).  She spoke with M.G.E. shortly thereafter and described him as "highly hesitant and very nervous.  He was very embarrassed, wouldn't even look at me for the first five minutes."  (*Id.* at 101).  M.G.E. told Officer Dean about the incident and she utilized protocol to have him moved to another pod immediately. (*Id.* at 102).

King and Carr "went to confront" Zaman.  (*Id.* at 76).[4]  King testified Zaman became "aggressive" and Carr testified that Zaman swung at King and then "blows were exchanged" between Zaman and King as inmate Carr watched.  (*Id.* at 76, 93).  Officer Dean testified that after the altercation, Zaman "was taken out" of the unit and ultimately transported to Huntsville Hospital "due to medical issues."  (*Id.* at 103, 106).  Dean further testified that because of privacy issues, the jail's cameras did not allow officers to see into the cells.  (*Id.* at 104).

During the remainder of his confinement, corrections officers asked M.G.E. five times if he wanted to press charges against Zaman, but M.G.E. declined because he feared Zaman.  (*Id.* at 54).  After a week or so M.G.E. told his mother about the incident and she encouraged him to press charges.  (*Id.* at 54-55).  Investigator Radke testified M.G.E. first came to his office on April 16, 2013.  (*Id.* at 107-108).  Other than M.G.E.'s version of the event, Radke had no other evidence, such as camera footage or other physical evidence, of the assault.  (*Id.* at 109, 117).  Radke spoke to Zaman and "orally" explained and "read him his [*Miranda*] rights."  (*Id.* at 110-111).  Zaman waived his rights and agreed to speak with Radke, who reduced his statement to writing and presented it to Zaman to

---

[4] King testified, "Wrong is wrong.  You know something is wrong.  M.G.E. was just a kid.  He wasn't exactly mentally capable of handling the situation like any other grown man can incarcerated in jail, and I just ain't never been one to sit back and watch somebody get took advantage of."  (*Id.* at 76-77).

8

gauge its correctness.  (*Id.* at 111-112).  Zaman read and signed the statement.  (*Id.*

at 112).  Radke testified that he did not threaten, coerce, or force Zaman to make

the following statement:

> On April 6th, 2013, between 9:00 p.m. and 9:25 p.m. Inmates King
> and Carr came into my cell and attacked me.  I believe it was because
> of what my cellmate was doing – what my cellmate was going around
> talking about things I said earlier that day.  They were in the cell
> talking with the young guy.  They had asked him how he would
> perform oral sex, and he showed us using a pen.  They asked him
> other sexual questions.  At no time did I ever have or let the young kid
> touch me or perform oral sex on me.  I have been in jail for 21 months
> and 16 months of that I was a trustee.  I have not touched or allowed
> anyone to touch me like that during that time. . . .  I have been here,
> why would I start now.

(*Id.* at 112-113; *see also id.* at 1-2 'Statement'[5]).  Radke denied ever telling Zaman

not to make a complaint against inmates King and Carr, whereupon Zaman

exclaimed, "Yes, he did," which prompted his own attorney to tell him to "Stop."

(*Id.* at 114).  Radke testified he gave advice to Zaman about what he could do to

secure warrants against King and Carr, but to his knowledge Zaman did not obtain

the warrants.  (*Id.* at 119-120).

 The defense called Zaman as a witness.  (*Id.* at 127).  After counsel referred

to Zaman's Muslim religion during *voir dire*, Zaman proclaimed he originated

from Pakistan and the Muslim culture punished homosexuality by beheading and

---

[5] The statement is prefaced with the following declaration: "I declare that the following
statement is made of my own free will without promise of hope or reward, or offer of favor,
without leniency or offer of leniency, by any person or persons whatsoever."  (*Id.* at 1).

cutting off hands.  (*Id.* at 127-128).  Zaman also declared Muslims in Pakistan did

not like tattoos and "don't play over there period," but that he "went on my rules.  I

got the tattoos."  (*Id.* at 128).

Zaman admitted that he had served one year in prison for three drug

distribution convictions and one possession conviction but he had never been

convicted of a violent crime.  (*Id.*).  At the time of trial, Zaman had been out of

prison for one year.  (*Id.* at 129).  He answered, "No, sir" when asked if he "had

any other incidents" or "criminal allegations" and testified, "My parole officer is

my witness.  I've been paying on time.  I've been working seven days a week.  I've

got two daughters, seven and eight.  And my uncle owns ten gas stations.  So I

work for my uncle.  And I also work for Popeyes.  My people own Popeyes" and

are "going to make me a general manager."  (*Id.* at 129, 148).

Zaman disagreed with the testimony from the State's witnesses, repeatedly

denying he ever had M.G.E. or any other man perform oral sex on him, and

declared the incident "never happened."  (*Id.* at 129, 142, 144-147).  Zaman also

repeatedly said that he was being prosecuted because he is Pakistani Muslim and

that Morgan County Jail officers and inmates alike had called him "sand n----r,"

and "Bin Laden."  (*Id.* at 130, 134, 142-143, 146-147, 149-150, 152).  Although he

complained in writing to the jail warden about every single officer who called him

names "[t]hey said you only Pakistan[i] guy in this jail, and we can treat you how you want … to treat you."  (*Id.* at 135).

Zaman acknowledged he had "all these guys," including M.G.E., "hanging out" in his cell on April 6, 2013.  (*Id.* at 151).   He admitted "sexual talk" took place and stated M.G.E. asked Preston about the size of his private parts and inmate Preston asked M.G.E. "to demonstrate how he would give a blow job." (*Id.* at 138-140).   Zaman declared that he never saw M.G.E. simulate a sex act with a pen and that he told M.G.E. "that they was messing with him.  I said stop messing with this guy, you know.  Only thing I remember he was [in C-Pod] for a couple of hours" and "[a]fter supper they transfer[r]ed him. . . .  [N]ext thing I know I'm in my cell washing my hands and two inmates come and beat me … [un]conscious." (*Id*. at 139).

Zaman testified that inmates King and Carr had a grudge against him because he had loaned them store goods and they had not repaid the loans.  (*Id.* at 132) (describing his loan rate as 100%, *e.g.* "give somebody one cigarette for two back").   He also claimed King and Carr "got Officer Hokett" to move him from a cell in C4 to one in C5, and that one morning King and Carr shut his cell door and refused him a smoke break after they had "little words" over his "cleaning cart" duty.  (*Id*. at 130).   When Officer Phillips told Zaman to let the incident go, he

purportedly chose to "never" hang out with King and Carr.  (*Id.*).  Zaman denied that his cellmate, Pierce Preston, "was one of" his "boys" and also denied intimating or saying to M.G.E. that Preston or anyone else would beat M.G.E.  (*Id.* at 144, 151-153; *see also id.* at 130, 144 & 150-51 (explaining he (Zaman) did not have "homeboy[s]"; Preston was "never" his boy; and Preston had put "a bomb on his chest" and robbed Zaman's uncle's gas station)).

Zaman declared he only had two conversations with M.G.E.: (1) that he had warned M.G.E. not to give away his food, and (2) that he gave M.G.E. a cigarette in the rec yard when M.G.E. said he needed one.  (*Id.* at 145).  Zaman also said M.G.E. mistakenly accused him of the offense because inmate Chris Hale occupied the cell next to his and Hale gave the candy bar to M.G.E.  (*Id.* at 136-138). Zaman further stated that each cell had a push button speaker to call for assistance "if you feel yourself trapped" or "scared" and asked, "[I]f you was a victim why did you not hurry up and push that."  (*Id.* at 142).   When posed with the fact that M.G.E. had only been in jail one or two days and asked how long he had been detained at that time Zaman answered, "I was over there sixteen month trustee, and I never have that kind of accident, sir."  (*Id.* at 151).  He also dismissed M.G.E.'s newness to jail stating, "I was [once] new to jail, but guess what, nobody can force

you[.]"  (*Id.* at 142).  On cross-examination, Zaman admitted he had lied to people and that he had been drug dealer.  (*Id.* at 149)("Q. You do lie? A. I lie, sir.").

When the prosecutor asked Zaman "what on earth would possess" M.G.E., someone detained for speeding tickets only, "to tell that kind of story about you if you didn't do anything," Zaman stated the prosecutor just wanted to prosecute him because M.G.E. was American and he was not.   (*Id.* at 150).  Zaman testified that when he asked Detective Radke about pressing charges against King and Carr, Radke told him that both inmates had felony sentences and "nothing [was] going to happen" because any sentenced they received for the assault would "run concurrent."   (*Id.* at 133-34).   Zaman insisted he was the victim because he "helped" M.G.E. by giving "him a cigarette on the rec yard," only to be beaten for "something I didn't do."  (*Id.* at 135).

Following the close of evidence, the trial court provided instructions to the jury.  (Doc. 5-3 at 2-17).  After deliberations, the jury found Zaman guilty of first degree sodomy.  (Doc. 5-1 at 22).  On October 28, 2015, the trial court sentenced to Zaman to 20 years in the penitentiary.  (Doc. 5-1 at 24-26; Doc. 5-3 at 24).

On November 16, 2015, Mr. Belser filed a notice of appeal and motion to withdraw as counsel.  (*Id.* at 27).  On December 7, 2015, Belser filed a motion for new trial on the ground that "[t]he verdict is contrary to the weight of the

evidence." (*Id.* at 30).  On December 8, 2015, the trial court denied the motion for new trial.  (*Id.* at 32).  On December 10, 2015, the trial court granted Mr. Belser's motion to withdraw and appointed attorney Tim Kyle to represent Zaman on appeal.  (*Id.* at 34).

## B.   Direct Appeal

On appeal to the Alabama Court of Criminal Appeals ("ACCA"), appellate counsel presented a brief asserting that he had "formed the opinion that the Record does not establish that there is any valid, reversible error issues preserved for appellate review in this case."  (Doc. 5-4 at 8).  Nonetheless, in accordance with *Anders v. California*, 386 U.S. 738, 744 (1967), counsel identified three issues for possible appellate review: whether or not the trial court committed reversible error in (1) sustaining an objection to Zaman's question to M.G.E. as to whether or not he could describe Zaman's penis, (2) denying Zaman's motions for judgment of acquittal and/or new trial, and (3) imposing a sentence of twenty years and denying probation.  (*Id.* at 8-9).

The ACCA afforded Zaman "an opportunity to present *pro se* issues to his counsel and to" the court.  (Doc. 5-6 at 2).  *See Bilal Uz Zaman v. State*, No. CR-15-0198, 231 So. 3d 1151 (Ala. Crim. App. Aug. 5, 2016) (table).  On June 2, 2016, Zaman filed an affidavit stating he spoke "very broken" English.  (Doc. 5-5

at 1). Zaman argued that his trial counsel was not versed in his native Pakistani language, Urdu and Panjabi, and thus did not "fully comprehend if" Zaman "knowingly, willingly, voluntarily, and intelligently waived" formal arraignment and "American Rights" with which he was" "not culturally familiar." (*Id.*).

Zaman further claimed coercion with regard to "all the forms" he signed "in the court" as he "did not understand what" he was doing and no one attempted to fully explain to him that he was signing his "life over." (*Id.*). Moreover, his trial was unfair because the trial court did not provide a translator, "everybody" was "white," and "no one like[s]" Muslim Pakistanis as they believe they are terrorists. (*Id.* at 1-2). Finally, Zaman asserted the jail did not provide him a translator, he did not knowingly waive his rights, and he signed "by force" the statement the investigator wrote and attributed to him. (*Id.*). Zaman attached to his affidavit a May 25, 2016, letter from "Terence K. Tubbs, ABE Instructor (BBCF)," who reported Zaman had enrolled as "a student of the Shelton State Community Education Program" on April 11, 2016. (*Id.* at 6). Tubbs reported that Zaman's G.E.D. test scores showed a reading level of 3.6, math level of 2.7 and language level of 2.4. (*Id.*). Tubbs related that Zaman had "poor understanding of reading materials with a substantial amount of detail about a topic." (*Id.*).

On August 5, 2016, the ACCA issued an unpublished memorandum

affirming Zaman's conviction after reviewing "the record in accordance with *Anders* and" finding "no basis for reversing the trial court's judgment." (Doc. 5-6 at 1-2). The ACCA found Zaman had presented "two pro se issues in which he cite[d] no authority for his assertions and . . . no portions of the record. His issues are actually statements declaring his innocence." (*Id.* at 2).

Zaman attempted to file an application for rehearing, but on August 24, 2016, D. Scott Mitchell, Clerk for the Alabama Court of Criminal Appeals, wrote a letter returning the application "unfiled" because neither Zaman nor his counsel of record had signed the document. (Doc. 5-9 at 1) (citing Alabama Rule of Appellate Procedure 25A(a) (requiring counsel of record or a party proceeding pro se to sign the application)). By the same letter, Mitchell notified Timothy Dempsey, who had signed the application as Zaman's "'preparer/advocate,'" and the General Counsel for the Alabama State Bar that Dempsey appeared to be engaging in the unauthorized practice of law. (*Id.*).

Zaman made no further effort to file an application for rehearing. For this reason, on September 20, 2016, the Alabama Supreme Court struck Zaman's petition for writ of certiorari. (Doc. 5-7) (citing Rule 39(c)(1), Ala. R. Crim. P. ("The filing of an application for rehearing in the Court of Criminal Appeals is a prerequisite to review by certiorari in the Supreme Court[.]")). On September 30,

2016, the ACCA issued a certificate of judgment.  (Doc. 5-8).

**C.     Federal Habeas Petition**

On October 13, 2016, the clerk of this court docketed the instant § 2254

federal habeas petition, which Zaman signed and dated October 8, 2016.  (Doc. 1).

In that application, Zaman raises the following claims:

> 1.     Zaman's inability to "fully understand basic [English]
> language" caused communication difficulties between he and trial
> counsel, thus depriving him of a fair trial as guaranteed by the
> Fourteenth Amendment.
>
> 2.     Court records have been falsified because the grand jury
> foreman used an electronic signature to sign the indictment, the
> indictment does not list   the victim or witnesses, and the "reporter's
> transcript is not a full [transcription] of all proceedings as required by
> the USCS C.R. Act."
>
> 3.     "[T]he court proceeded on information only" and the language
> barrier between counsel and Zaman effectively resulted in no counsel,
> thus violating Zaman's right due process and the right to counsel
> under the Alabama and United States Constitutions.
>
> 4.     The Alabama Court of Criminal Appeals deprived Zaman of
> due process and a "full and fair review" on direct appeal when it
> "refused to accept and address points" he raised "under the *Anders*
> procedure."

(*Id.* at 5-6).

This court issued an order to show cause, and on November 3, 2016, the

State filed an 11-page Answer, plus approximately 314 pages of appended record

from the state court trial and collateral proceedings.  (Doc. 5).  The State concedes

the timeliness of the claims in Zaman's habeas petition under 28 U.S.C. §
2244(d)(1), but denies he is entitled to relief because his claims are unexhausted
and procedurally defaulted.  Additionally, it argues that he has shown neither cause
and prejudice to overcome the defaults or that a miscarriage of justice will occur if
the court does not hear his claims.  (*Id.* at 4-8)  In a footnote, the State also asserts
the following:

> To the extent that Zaman raises a claim of ineffective assistance
> of counsel in his habeas petition, that claim could still be timely
> presented to state courts in the form of a Rule 32 petition filed in
> accordance with Rule 32 Ala. R. Crim. P.  The Respondents are
> unsure as to the precise nature of this claim and merely raise this point
> in an abundance of caution.

(*Id.* at 7 n. 3).[6]

---

[6] On April 19, 2018, some 18 months after the State filed its answer in this action, Zaman mailed
a petition pursuant to Rule 32 of the Alabama Court of Criminal Procedure to the Morgan
County Circuit Court; that action is currently pending. *See Bilal Zaman v. State of Alabama*, CC-
2014-000791.60, available at https://v2.alacourt.com, the State of Alabama's online court
records' database; *see also*, Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that
is not subject to reasonable dispute because it . . . can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned."). The undersigned notes that Zaman's
conviction became final on direct review when the ACCA issued the September 30, 2016,
certificate of judgment.   (Doc. 5-8).  Because the one year statute of limitations to file a federal
habeas petition expired on September 30, 2017, it appears any claims in Zaman's Rule 32
petition would barred from review. *See Wood v. Milyard*, 566 U.S. 463, 468 (2012) (quoting 28
U.S.C. § 2244(d)(1)(A) (an application must be filed within one year of "'the date on which the
judgment became final by the conclusion of direct review or the expiration of the time for
seeking such review.'")); *Sibley v. Culliver*, 377 F.3d 1196, 1204 (11th Cir. 2004) (alteration
supplied) ("once the [AEDPA] deadline has expired, there is nothing left to toll. A state court
filing after the federal habeas filing deadline does not revive it."). The State court issued an order
this month, requiring the State to respond to the petition.

On November 4, 2016, the undersigned notified the parties that the court deemed "the case ripe for summary disposition under Rule 8(a) of the Rules Governing Section 2254 Cases" and further notified Zaman "of his right to file affidavits or other materials to show why the petition should not be summarily denied or dismissed on the basis of the answer and record supplied by the State." (Doc. 6 at 1-2)(citing *McBride v. Sharpe*, 25 F.3d 962 (11th Cir. 1994)).   On December 13, 2016, Zaman filed motion requesting issuance of the writ, which the undersigned deemed a response to the State's Answer.  (Docs. 10-11).  In addition to addressing exhaustion, Zaman argued his "actual innocence" based on insufficiency of the evidence to support the first degree sodomy conviction.  (Doc. 10).

In April 2017, Zaman requested additional time to file a response to the State's answer, asserting that he did not speak or comprehend "good [E]nglish" and no longer had the assistance of the inmate who had been helping him.  (Doc. 12).  The undersigned granted Zaman's request.  (Doc. 13).  On April 13, 2017, Zaman filed an additional response and relies on 28 U.S.C. § 2254(b)(1)(ii) to assert that this court may provide habeas relief "if circumstances exist that render [the State's] process ineffective to protect the rights of this petitioner."  (Doc. 14). In support thereof, Zaman alleges "at the time of the trial proceedings his counsel

knew he couldn't speak good [E]nglish or understand good [E]nglish to prepare for trial proceeding as required by law." (*Id.* at 1).

## II.   Federal Habeas Review Standards

### A.   Limits on the Availability of Review: Exhaustion and Procedural Default

A federal district court may entertain an application for a writ of habeas corpus filed by a person in custody pursuant to the judgment of a state court if his custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).   However, a state prisoner's failure to first exhaust the remedies available in the state courts of his conviction renders him ineligible for relief under § 2254.  *See* 28 U.S.C. § 2254(b)(1)(A); *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004).   The exhaustion rule requires the federal courts to allow the states the initial "opportunity to pass upon and correct errors of federal law in the state prisoner's conviction."   *Fay v. Noia*, 372 U.S. 391, 438 (1963).

To properly exhaust his claims a prisoner must fairly present his federal constitutional claims through one complete round of the State's trial and appellate review process, either on direct appeal or in State post-conviction proceedings. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999) (observing the question is "not only whether a prisoner has exhausted his state remedies, but also whether he

has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts.").  In Alabama, this includes presentation to the Alabama Supreme Court.  *See Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003). Where a claim has not been exhausted in the state courts and the time in which to present the claim has expired, federal courts deem the claim procedurally defaulted and habeas review precluded.  *See Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991); *Ferguson v. Sec'y for Dep't of Corr.,* 580 F.3d 1183, 1193 (11th Cir. 2009).

**B.     Overcoming a Failure to Exhaust or a State Procedural Default**

**1.     Cause and Prejudice**

When a state prisoner fails to exhaust and procedurally defaults a federal claim in the state courts, habeas review on the merits of any such claim can occur only upon a showing of either (1) "cause" for the default *and* resulting "prejudice." *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1179-80 (11th Cir. 2010).  "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court."  *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (quotation marks and citation omitted); *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986)(same).  "To establish 'prejudice,' a petitioner must show that there

is at least a reasonable probability that the result of the proceeding would have been different." *Id.* (citation omitted).

## 2. Manifest Injustice

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Henderson v. Campbell, 353* F.3d 880, 892 (11th Cir. 2003). The "miscarriage of justice" exception applies "where a constitutional violation has resulted in the conviction of someone who is actually innocent." *House v. Bell*, 547 U.S. 518, 536 (2006) (citation omitted). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Id.*, 547 U.S. at 536-37 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). This standard "is demanding and permits review only in the 'extraordinary' case." *Schlup*, 513 U.S. at 327 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). "'[T]o be credible' a gateway claim requires 'new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324).

In his initial response brief, Zaman asserts actual innocence based on insufficiency of the evidence to support his conviction. First and foremost, Zaman did not raise this claim/issue in his habeas petition. But even if he had, Zaman has not alleged facts to support manifest injustice. Indeed, the allegations underlying the claim/issue are based exclusively on evidence presented at trial, not "new evidence" demonstrating actual innocence. The actual innocence exception is "exceedingly narrow in scope" and requires proof of actual innocence, not *legal* innocence, as Zaman argues. *See Johnson v. Alabama,* 256 F.3d 1156, 1171 (11th Cir. 2001). Accordingly, Zaman may not utilize actual innocence as a gateway to federal review of his procedurally defaulted claims, *see infra*.

## C.     Limits on the Scope of § 2254 Review

Even where this court reaches the merits of a federal claim, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), significantly limits the scope of review. *See also,* 28 U.S.C. § 2254; *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). When the state court adjudicate the claim on the merits, § 2254 precludes habeas relief unless the state court's adjudication of the claim resulted in a decision (1) "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or

(2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2) (alteration supplied). Further, federal courts presume the correctness of factual determinations by state courts, subject to rebuttal only upon a showing by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has explained that "[a] state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams*, 529 U.S. at 405; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). The Supreme Court has likewise stated that "[a] state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Id.* (citing *Williams*, 529 U.S. at 405; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)).

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of the decisions of the United States Supreme Court, in precedent issued at the time the state court rendered its decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Yarborough v. Alvarado*, 541 U.S. 652, 660-

661 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *see also Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998) ("[A] district court evaluating a habeas petition under § 2254(d) should survey the legal landscape at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority" (internal quotation marks and citation omitted), *overruled on other grounds by Williams*, 429 U.S. at 409, as stated in *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001)).  By contrast, "clearly established Federal law" does not include decisions of lower courts.  *Renico v. Lett*, 559 U.S. 766, 778-79 (2010).

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt."  *Renico,* 559 U.S. at 773 (citations and internal quotation marks omitted).  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting *Williams*, 529 U.S. at 410 (emphasis supplied)).  "Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'"  *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).  Rather,

> [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on

25

> the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).... "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted).

*Richter*, 562 U.S. at 101. Likewise, "a state-court factual determination is not unreasonable [for purposes of § 2254(d)(2)] merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] trial court's ... determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-342 (2006)).

## III.   Discussion

Respondents answer that Zaman's habeas claims are unexhausted and procedurally defaulted because (1) he failed to properly present his claims before the Alabama Court of Criminal Appeals and the Alabama Supreme Court on direct appeal, and (2) there are no longer any avenues for him to do so. (Doc. 5 at 6-7).[7] Specifically, Respondents correctly assert the ACCA rejected Zaman's petition for

---

[7] Respondents correctly point out that Zaman never raised habeas claims three and four in the state courts. (Doc. 5 at 7).

rehearing on the ground that he submitted the document without his signature or that of a licensed attorney, in violation of appellate rule Rule 25A(a).   (*Id.*). Respondents also declare the Alabama Supreme Court struck his petition for writ of certiorari as untimely.   (*Id.* at 7).   However, the record shows the Alabama Supreme Court struck the appeal because Zaman failed to file an application for rehearing before the ACCA, as required by Rule 39(c)(1), Ala. R. App. P., not because he failed to file the application within 14 days of the ACCA's decision, as required by Rule 39(c)(2), Ala. R. App. P.  (Doc. 5-7).

Zaman admits he failed to raise the federal petition issues on direct appeal, but argues the ACCA and Alabama Supreme Court refused his requests for "judicial notice" and appointment of counsel.  (Doc. 1 at 6).   This argument lacks merit.  Zaman does not explain what he means by the phrase 'judicial notice' and he was undisputedly appointed counsel to represent him on appeal before the ACCA. A petitioner has no constitutional right to counsel when pursuing rehearing before that court or certiorari review in the Alabama Supreme Court.  *See Pennsylvania v. Finlay*, 481 U.S. 551, 555 (1987) ("a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction" beyond the first level of direct appeal); *Powell v. Arrington*, Case No. 2:12-cv-02723-SLB-TMP, 2015 WL 4749182 at *4 (N.D.

Ala. Aug. 11, 2015) ( no constitutional right to have counsel explain or pursue discretionary proceedings such as rehearing or certiorari review)

In his December 2016, response to Respondents' answer, Zaman appears to argue that either (1) he exhausted his state remedies *or* (2) that he was not required to do so because the ACCA affirmed his conviction and sentence based on the *Anders* brief, and "there were no issues to resolve or exhaust in" the "State appellate courts" because those courts "agreed with counsel" that "no valid reversible errors were preserved for review." (Doc. 4 at 4). These arguments lack merit.

Rule 39(c)(1), Ala. R. App. P. required Zaman to file an application for rehearing before the ACCA as a prerequisite to certiorari review in the Alabama Supreme Court. Although the Clerk of the ACCA rejected Zaman's application, he also informed Zaman in an August 24, 2016, letter that the Alabama Rules of Appellate Procedure required him or an attorney to sign the document for filing purposes. (Doc. 5-9). Zaman never attempted to sign and file the application in the ACCA nor did he move the ACCA to suspend the time for filing the application so that he could comply with the Clerk's instructions. *See* Rule 2(b), Ala. R. App. P. (providing that "for . . . good cause shown, an appellate court may suspend the requirements or provisions of any of these rules in a particular case on

application of a party or on its own motion and may order proceedings in accordance with its direction); *see also*, Rule 40, Ala. R. App. P. (providing that an application for rehearing must be filed "within 14 day (2 weeks) of the date the decision being questioned is issued").  Because he never filed an application for rehearing, on September 20, 2016, the Alabama Supreme Court struck the Zaman's September 4, 2016, petition for writ of certiorari.  (Doc. 5-7).  Therefore, Zaman's habeas claims are unexhausted.

Zaman admits that it "would be futile" to attempt to present the claims through the State's Rule 32 procedure because the court would find the claims precluded for failure to raise in at trial or on direct appeal.  (Doc. 10 at 4). According to Zaman, even if the preclusion rules were not applicable, because "there is no right to counsel in State post-conviction proceedings," he would "'again'" be "hampered in his ability to properly and adequately present his claims and supporting authorities."  (*Id.*).  Therefore, he concedes the procedural default of his habeas claims and affirmatively rejects any further opportunity to exhaust any ineffectiveness claims in state postconviction proceedings.

To the extent Zaman may be proffering the ACCA's and Alabama Supreme Court's denial of his request for appointed counsel during rehearing and certiorari review as cause to overcome the defaults, he cannot do so because, as set out

*supra*, he is not entitled to appointed counsel during discretionary review.  Finally, Zaman cannot argue that 28 U.S.C. § 2254(b)(1)(ii) grants this court authority to provide him habeas relief based on the allegation that his trial counsel knew that he could not speak or understand "good [E]nglish to prepare for trial . . . as required by law."  (Doc. 14).[8]  Zaman's allegation presents nothing more than a potential ineffective assistance of trial counsel claim and § 2254(b)(1)(ii) applies only "if circumstances exist that render [the State's] process ineffective to protect the rights of the applicant."  As set forth by the Respondents in the answer filed November 3, 2016, Zaman did have a state process available to him to present such a claim through Rule 32 Ala. R. Crim. P.  (Doc. 5 at 7, n.2).  In his December 13, 2016, response, Zaman eschewed the opportunity on the ground that he was not entitled to counsel during postconviction proceedings.  Accordingly, Zaman's habeas claims remain unexhausted and procedurally defaulted.

## IV.  RECOMMENDATION

Based on the foregoing, it is recommended that Zaman's petition for a writ of habeas corpus is due to be **DENIED**.

---

[8] Zaman also discusses the United States Supreme Court's interpretation of *Anders* procedure in *Smith v. Robbins*, 528 U.S. 259 (2000), but takes no issue with the constitutionality of the procedure utilized by the ACCA in the context of either Supreme Court case.  (Doc. 14 at 1-3).

## Notice of Right to Object

A petitioner may file specific written objections to this report and recommendation.  The petitioner must file any objections with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the petition that the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order.  In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice.  11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's

findings of fact and recommendations.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

The petitioner may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  The petitioner may only appeal from a final judgment entered by a district judge.

**DATED** this 24th day of June, 2019.

JOHN E. OTT
Chief United States Magistrate Judge